Reed, P. J.,
delivered the opinion of the court.
■ The action was brought by the appellee against appellant to recover the value of a number of cattle conveyed to appellant through a chattel mortgage, while appellee had also a chattel mortgage upon the same property for the purchase price. The facts and history of the case are, to say the least, peculiar, and, although rather lengthy, require statement for a proper understanding.
One John Strang, living at Longmont, Boulder county, if not insolvent, without money or financial standing, wished to purchase a number of dairy cows. He applied to the appel *52 lant, who was possessed of some means, to assist him. First applied for assistance to purchase from a person named Emmons. For some unexplained or occult reason, appellant advised against the purchase, and said to him, “ It would be very foolish of you, trying to buy cattle of a neighbor as close as that.” Strang came to Denver, found the cattle he wanted in the yards of appellee and brother, who were dealers in cattle, selected a lot amounting to $720, purchased them, gave his check upon a bank at Longmont for $150, executed notes payable at different times for the balance, and a chattel mortgage upon the cattle purchased to secure the notes, and received a bill of sale, of which the following is a copy :
“Denver, Colo., April 17th, 1893.
“In Account with Star Stables and Stockyards.
“ Horses, Mules and Cattle eor Sale.
“ C. W. Harris, Prop. 1742-1752 Wazee St.
“This is to certify that we have this day sold to John Strang seventeen head of cows and one bull for value received. The title of said cows we guarantee.
“ C. W. Harris & Brother.”
This was late in the afternoon of April 17th. The cattle were to be shipped by the vendors to him early the next morning, and were so shipped.' Strang had no money in the bank to pay his check, and relied upon appellant to pay it. Strang, immediately after executing the papers in Denver, on the evening of April 17th, took train for Longmont, saw appellant, and what transpired is the evidence of appellant. After admitting his advising Strang not to buy from a neighbor, he proceeds: “ He went to Denver. When he came back he told me that Mr. Harris had some cows for sale. I refused to let him have the money to pay half down on $40.00 cows. Told him I would loan him $150. You can buy ten cows or more, but I must see the cows. There can’t be any money getting away from me until I am satisfied that the title is good, because I do not deal in seconds. Told him I could not say whether I would or would not loan him any more; it *53 would depend upon my judgment after I saw the cows. Think he said he had bought the cows and was to pay half down. Told him I might let him have $150, if the cows satisfied me when I saw them. Said he bought the cows and they threw in one bull. I says, ‘ How is it that you get people to sell you cows in that way.’ ‘ Oh,’ he says, ‘ I knowed them ; ’ and he says, ‘ They are going to take my note; I paid them $150 down.’ ‘Well,’ I says, ‘that is better; perhaps you can get out of it in that way.’ Said he got seventeen Iowa cows and a Jersey bull, and that Mr. Harris said the calves from the bull sold for $100 a piece. The next night he came up with the bill of sale. I says, ‘ It must be a clean bill of sale. I will then loan you the money if there is nothing against the cattle.’ He came up with a clean bill of sale. I think it was the seventeenth. I sat down and wrote the mortgage, because I told him I would if he brought me a clean bill of sale. It was late at night when I got that mortgage wrote. I says, ‘ I won’t disturb Mr. White to-night to take the acknowledgment.’ Strang came around early in the morning of the eighteenth, and acknowledged the mortgage. I wrote a letter the same day, before that, to the bank that I was busy, and if he brought a clean bill of sale with no incumbrance against the stock, — I wanted them to satisfy themselves of that from the record, — and they could pay the money and charge me. I took the mortgage and let him have the $150 as was stipulated that he was to pay on the cows. . And then there was $20.00 freight to be paid, which I either paid or gave him to pay. He also stipulated that there would be a note coming due to the man he bought the cows of; I think he said in June. I was going to the world’s fair, and he said he wanted enough money put in my mortgage to pay one half of that note, which was done. The cows came up on the eighteenth. The depot agent went to the yard to unload them with him, and verified the bill of lading. Strang said he would like for me to go down to the yard and look at the cows. He says, ‘ I have got to take them out to Mulligan’s. Mulligan is going to take care of *54 them. (I knew he had leased a farm, for he told me so.) But I have not got anybody to milk them, and I will have to take them to Mulligan’s.’ I went to the depot to see the freight paid, and the depot agent went with me, and we looked at them and we saw those cows unloaded there. He got the cows unloaded and got them over to Mulligan’s and this man (Groves) tells me about meeting them. After I got to Chicago Mr. Strang wrote to me he wanted to pay some money on the cows to the man in Denver, and I wrote him a check. I loaned Strang money on the ten head of cattle in two bunches, six and four. On the twentieth of July, 1893, John Strang owed me somewhere about $600, that is, as I run up the notes, putting the interest in.”
The cattle, on the 18th, on the day of their arrival, were driven into the adjoining county of Weld, arriving late in the evening.
The mortgage to appellee contains this clause: “ Said cows to be kept in the town of Longmont, state of Colorado.” The mortgage was filed for record in the city of Denver, at 9:30 a. m., April 20th. That executed to appellant was filed for record in the county of Weld at 8:30 A. M., April 20th.
The following letter was written by appellant, at its date, to the bank at Longmont:
“ Longmont, Colo., April 15, 1893.
“Eben White, Esq., First National Bank:
‘•'■Dear Sir — If there should be any inquiry from Denver as to John Strang’s promise to pay $150 due bill on notes on presentation at your bank, say it will be honored if accompanied with a bill of sale, ten or more cows, made in his name, as I have given John Strang liberty to depend on my furnishing that amount to him if he needs it to make this purchase (he to find me security) (this is private business).
“ Respectfully,
“ J. M. Mttmeord.
“ No. 2 — This is to be a clear bill of sale if the $150 is sent *55 off, as I do not agree to loan him to make a partial payment, on account, and he was not to encumber the property in any shape, that I agreed to loan him the money to buy, unless he gave me the first security on it with some additional security, and will not be sent, if not as here written.
“Yours, J. M. M.
“ April 15, 1893.
“ P. S. — I thought best to notify you that I go to the farm to see to the trees setting out, etc., etc.”
The check arrived about 12 (noon). The banker telephoned recorder’s office at Denver, learned that no chattel mortgage had been filed there, paid the check. Appellee was not asked whether he had one. There is a very noticeable discrepancy. In the postscript to the letter written to the banker, he informs him that he thought best to notify him, as he was going to the farm to plant trees, etc. In the evidence, he states that the reason of his requiring the bank to telephone was because he was away.
Groves testified: “ That Mumford goes to the bank and took Strang with him. Strang stood on the sidewalk and Mumford went into the bank and asked the banker to telephone to Arapahoe county, to the county seat I suppose, where the mortgage was, to see if there was a mortgage on these cattle. As Mumford was talking to Strang on the side1walk, the banker came and gave him the nod that it was all right.”
At the maturity of Strang’s first note to appellee for $40.00, May 17th, it was paid, $30.00 of the money having been furnished by appellant for that purpose. Default was made in the payment of the next note, due June 17th, and all subsequent notes, and appellee on writing to Strang had his letter returned. After some days got information that Strang had absconded. The date of his leaving and the date appellee learned the fact is not shown.
Groves, who had charge of the cattle and other property of Strang in Weld county, testified : “ Strang went to Denver *56 and did not come back; I know Mumford; he came to the ranch a little before Strang went away ; was looking around at the stock and seemed to have a good deal to say about them; came again on the tenth day of July to ask me where John Strang was; told him I did not know ; told me he had a mortgage on all the stock there; wanted to know if I would work for him and give.the cattle up; told him I would if he would pay me what Strang owed me; after which he gave me five mortgages; he said if any come to claim the cattle to show them these mortgages; asked if I had a gun ; I said, ‘ no, but had a dog ; ’ he said if any one came day or night up to his place to let him know; if they come in the night and tried to bother me, to come up and he would give me assistance ; said I was to keep a horse saddled up, ready'-, so that I could be in readiness to come up; after starting away he yelled back and says : ‘If you let them cattle go I shall not pay you.’ Six or seven days afterwards saw Mr. Harris; had never seen him before; he came to look after the cattle; said he had a mortgage on them ; I told him they were there; the cattle that came in on the train; I showed him the cattle; he knew.them and showed me the mortgage; he came back again in a few day's; the cattle went away the night before. Mr. Mumford and three men took the cattle about 9 o’clock at night; took seventeen cows, one bull and a calf and seventeen hogs; Mumford also took a horse and buggy and buekboard and harness, a mare and colt and another mare belonging to Strang; Mumford sold ten other head of cattle belonging to Strang, to Mr. Emmons, also a horse.”
These facts, to say the least, are peculiar when taken in connection with appellant’s statement in evidence: “ The first I ever heard of it [the mortgage] was on the 10th of July.”
In the pleadings, the answer of appellant traversed some of the allegations of the complaint, all that were material, set up his own chattel mortgage and asserted title. Under it, by the replication, plaintiff, at great length and with great particularity1-, set up the facts and circumstances attending *57 the transaction, a conspiracy on the part of appellant and Strang to defraud the appellee, and, in effect, that by reason of such conspiracy and proceedings, the mortgage of appellant was fraudulent and void. It was also alleged by plaintiff that the claim of appellant was fictitious, and that there was no existing indebtedness against the property claimed by appellee. This issue became an important factor upon the trial, and much evidence was introduced by both parties upon such issue. A trial was had to a jury; the verdict for the plaintiff (appellee) ; judgment upon the verdict, and an appeal to this court.
Appellant, in argument, bases his claim to a reversal upon the fact that the appellee recorded his chattel mortgage in the wrong county; that Arapahoe county, where the stock was at the time of the execution of the mortgage, was not the proper county for record; that it shquld have been in some other county, but in what county I can hardly determine from the argument. Counsel say that, although Strang stipulated in his mortgage that the cattle were to be shipped to and kept at Longmont, in Boulder county, the cattle only passed through that county in transit to Weld county.
Between appellee and Strang there was no agreement or understanding that the cattle were to go to Weld county, Yet the contention seems to be that by Strang’s disregard of his contract in the mortgage and a fraud upon appellee by immediately placing the cattle in Weld county that, although unknown to appellee, that was the proper county for record. It is clear, if, as asserted, Boulder county was only incidentally, for a few hours, a stopping place of the cattle in their transfer to Weld county, where they were domiciled, a record of the chattel mortgage in that county would have been unavailing and no legal notice to any one. Hence the logical conclusion from the argument is, that by reason of the fraud perpetrated by Strang upon appellee, of which he had no knowledge, his record should have been made in Weld county, and that appellant’s mortgage took precedence by reason of a record in Weld county. One fact seems to have *58 been overlooked by the learned counsel. Admitting the facts established that the cattle were in Denver and were to be removed to Boulder county, at the time appellant’s mortgage was executed the cattle were in neither Boulder nor Weld county, but in transit. Both parties were in the same situation as to the domicile of the cattle, except that at the time of the execution of the first they were actually domiciled in Arapahoe county, and when the second mortgage was made they were in transit, without domicile, and their future domicile any county that might be selected to suit the purposes or convenience of those in control. The first mortgage provided for a domicile in Boulder county, the second in Weld. Which would have been the proper county for record, had the mortgagor violated the second contract as he did the first, and only passed through Weld in transit to an adjoining county, and there located the cattle ? The second contention is that appellant’s mortgage, having been recorded in the county of Weld an hour earlier than the mortgage of appellee in Arapahoe county, vested the mortgage title in appellant.
These two contentions involve the correctness of the instructions given by the court, and the refusal to give those asked bj^ appellant. If those were the only questions involved, it would of necessity require a construction of the statute in regard to the proper county for record, and also a careful examination of all the instructions given and refused; but before proceeding to such discussion, two important issues, tried and submitted to the jury as questions of fact, may be considered: First, that of conspiracy and fraud of appellant and Strang, and the consequent invalidity of appellant’s mortgage; second, whether, after applying the proceeds of the other property, about which there was no controversy, there was anything due from Strang to appellant.
All the evidence shows an amount of premeditation and crookedness in regard to the transaction with appellant and the dealings and transactions between appellant and Strang incompatible with honest dealing and intention. The badges *59 and earmarks of fraud were so marked and conspicuous, when taken in connection with the evidence of appellant, Groves and others, that the jury were warranted in the inference that the whole transaction was colorable and so infected with dishonesty as to invalidate it; and this was not obviated by the evidence of appellant, but rather emphasized. In regard to the debts alleged to have been contracted by Strang, he testified : “ Had dealings with Strang in 1893. Had some dealing before this deal. My journal shows that I loaned him $5, $10 and $30, at a time. * * * I took the mortgage and let him have $150, as stipulated, then paid $20 in freight.” Here the aggregate amount stated is $215. Again: “ The five mortgages I told you about is all the mortgages I took from Strang. I never done $300 worth of business with him before that. I did do business with him before that. I loaned him $5, $10 and $15 and when it got enough I would put it in a mortgage.” Again : “ Q. How much was paid and how much- was due, and what property was covered to secure these debts ? A. Well, there is nothing paid on these that I know of. There is other transactions that he paid me, and when we got up to an amount big enough it was put in a mortgage. He did not pay nothing. They run on the mortgage and are of course small amounts. I made him pony up as well as I could because he didn’t have nothing,” etc.
He exhibited five different chattel mortgages, — one $150, $162.75, $90.50, $62.75, and the one in question $200, making-in the aggregate $666. The first was secured on one brown horse, six cows, four sows, and one set single harness ; the second by one chestnut sorrel mare, one mouse colored mare, one horse colt, one mare colt and three cows. The next ($90.50) covers one black saddle pony worth $50.00, saddle worth $20.00, road wagon worth $40.00. The next ($62.75) covered fifteen black shoats and two white pigs. All this property, in addition to the Harris stock, was at the ranch and taken away at the same time, and in the night. Although closely pressed by counsel, appellant evaded and failed to give any statement of the money advanced by him as the consider *60 ation of the mortgages, but declared $600 to have been due him from Strang at the time he took possession of the property. Groves swore that he at the time stated it to be $400. Groves, who had the property in charge, testified as to the value of the property taken, aside from the Harris lot: “The hogs were worth about $105, and ten head of cattle he sold to Emmons were worth $25.00 per head ($250), the buckboard was worth $35.00, harness $10.00, the horses $260, aggregating $650, which, added to the sums admitted to have been received by appellant, makes the gross amount, exclusive of the Harris stock, considerable over $800.”
It is evident that every time Strang became possessed of any personal property, it was immediately covered up by a chattel mortgage to appellant. It is impossible to tell on what grounds the verdict of the jury was based. There was warrant in the circumstances and evidence to find the mortgage of appellant void and invalid from fraud in its inception; second, from the lack of definite evidence that the alleged indebtedness on which the different chattel mortgages were based was bona fide, and the mortgages for proper consideration ; and, third, that there was nothing due after applying the other property, — either of which would have been conclusive, regardless of the question of record. The instructions upon these are short, lucid and unobjectionable, fairly submitting the only questions of fact involved.
It is evident the jury found one or both of the issues against the appellant, and such finding was conclusive of the ease, regardless of other issues.
The question as to the proper county for the record of chattel mortgages is so presented by both parties that a construction of the statute becomes obligatory. Section 385, Mills’ Stats., is: “ No mortgage on personal property shall be valid as against the rights and interests of any third person or persons, unless possession of such personal property shall be delivered to and remain with the mortgagee, or the said mortgage be acknowledged and recorded, as hereinafter directed.”
*61 The law of record, so far as this case is involved, is the first clause of section 387, Mills’ Stats.: “ Any mortgage of personal property so certified, shall be admitted to record by the recorder of the county wherein the property mortgaged, or the greater part thereof, shall be situated.”
The use of the word “ shall ” in the paragraph last cited may be unfortunate, but in legal parlance is frequently used to designate present time. It may depend upon the context, and frequently does, and from the context the intention of the legislature is to be determined. “Whether ‘shall’ imports futurity depends upon the subject-matter and the context.” Hannibal & St. J. R. Co. v. Board of Equalization, 64 Mo. 304.
It is clear to me that the word “ shall,” in the connection in which it is used, is the situs of the mortgaged property at the time of the making of the mortgage. Property must of necessity have a situs in order to fix the record county. Such situs was at the time, and until subsequent delivery, in the county of Arapahoe, and property in possession of the vendor, — mortgagee. The mortgagor was to retain the possession. He covenanted, or at least contracted, that such possession was to be retained in Boulder county. Violating such agreement, he ran the stock through into Weld county. The validity of the mortgage, as to third parties, without actual notice, was dependent upon the record. The character of the property Avas such that, either by the intentional dishonesty of the mortgagor, or the voluntary straying of the cattle Avhen turned upon the range, their habitat might be any one of half a dozen or more counties. The mortgagee could not be required to accompany the stock and put his mortgage of record in every county in AAdiich the mortgagor should temporarily domicile them, nor could the validity of the mortgage be dependent upon the expressed intention, as in this case of a dishonest man, as to where they were to be kept, when, to defeat his own contract and defraud the other party, he immediately chose a third county. If the construction contended for is correct, he might have passed them *62 through Weld county and defeated the second mortgage. Such construction would lead to endless fraud, and offer a standing reward for dishonesty. Our conclusion is that Arapahoe county was the proper one for the record.
At the time the second mortgage was drawn, the stock was in Arapahoe county. Early the following morning, when the document was acknowledged and delivered, the cattle were in transit, — had no situs, — but were actually in either Arapahoe or Boulder county, and the expressed intention of the mortgagor to place them subsequently in Weld county was no more conclusive of the proper county for record than the contract in regard to the county of Boulder in the first. It depended upon the honesty and subsequent conduct of the vendor. The cattle at the time of the second mortgage being in transit, and having no domicile in Weld county, it is clear that if the record was to depend upon their accidental geographical location at the time the instrument was executed, it should have been put of record in either Arapahoe or Boulder counties. It follows that Weld county was not the proper county; that it was immaterial whether the record was earlier or later than appellee’s record.
The instructions asked by the defendant, numbered from 1 to 6, both inclusive, and refused, and such refusal assigned for error, were properly refused. Thejr each embrace a proposition of the law at variance with the views above expressed in regard to it.
The judgment of the district court will be affirmed.

Affirmed.